ATTORNEYS FOR APPELLANTS
J. Kevin King
Peter Campbell King
Columbus, Indiana

ATTORNEYS FOR APPELLEE, DANIELS COMPANY, INC
Jeffrey W. Ahlers
Todd C. Barsumian
Evansville, Indiana

ATTORNEY FOR APPELLEE, SOLAR SOURCES, INC.
R. Steven Johnson
Terre Haute, Indiana

ATTORNEYS FOR AMICUS CURIAE, DEFENSE
TRIAL COUNSEL OF INDIANA
Knight S. Anderson
Indianapolis, Indiana

James D. Johnson
Evansville, Indiana

# In the
# Indiana Supreme Court

No. 14S01-0602-CV-37

STEPHEN L. VAUGHN AND
MELINDA VAUGHN,

> *Appellants (Plaintiffs below),*

v.

DANIELS COMPANY (WEST VIRGINIA),
INC. AND SOLAR SOURCES, INC.,

> *Appellees (Defendants below).*

Appeal from the Daviess Circuit Court, No. 14C01-9712-CT-404
The Honorable Robert L. Arthur, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 14A01-0111-CV-408

**February 7, 2006**

**Boehm, Justice.**

We hold that "use" of a product under the Indiana Products Liability Act does not include assembly and installation where the seller retains an obligation or arrangement with the purchaser to deliver a fully assembled and installed product. Because the plaintiff was injured in the process of installing the product on behalf of its supplier, he is not a consumer or user of the product that had not yet been assembled as required by the purchaser and has no claim under the PLA. For this reason, his negligence claim is not governed by the PLA.

### Factual and Procedural History

At some time before December 1995, Daniels Company, Inc. contracted with Solar Sources, Inc. to design and build a coal preparation plant on Solar's premises in Cannelburg, Indiana. As part of its contract with Solar, Daniels was to design and install a heavy media coal sump. Based on Daniels's design, the West Virginia Steel Corporation manufactured the unassembled coal sump and shipped it to Solar's Cannelburg site. Daniels subcontracted with Trimble Engineers and Constructors, Inc. to construct the coal plant, including assembly and installation of the sump.

On December 12, 1995, plaintiff Stephen Vaughn, an employee of Trimble, was injured when he fell approximately fifteen feet from the top of the sump in the process of assembling it. He had been standing on a metal grating approximately two feet below the upper rim of the sump, attempting to assist others in affixing a large pipe at the top of the sump. When the pipe was placed by a forklift, other Trimble employees attached a chain to it, and the forklift moved away. As the forklift withdrew, the pipe fell off the sump, pulling Vaughn with it. Although he was aware of the danger, Vaughn was not wearing a safety belt. He suffered multiple injuries in the fall.[1]

Vaughn sued both Daniels and Solar, alleging negligent design, manufacturing, and maintenance of the sump and the processing plant. He also asserted a strict liability claim

---

[1] Vaughn's injuries included a fractured tibia and fibula, a facture of the radius and ulnar bones in his wrists, fractures of bones in his hand and foot, and two broken ribs.

2

against Daniels under the Indiana Products Liability Act ("PLA"). Vaughn's wife Melinda claimed loss of consortium.

Both Daniels and Solar moved for summary judgment. The trial court granted both motions for summary judgment, concluding that neither Daniels nor Solar owed Vaughn a duty of care, and that Vaughn was not a "user" or "consumer" of the coal sump within the meaning of the PLA.

The Vaughns appealed, claiming that the trial court erred in determining that Vaughn was not a "user" or "consumer" under the PLA and in finding no negligence in the design of the facility. They also contended that the trial court erred in striking a portion of an affidavit that the Vaughns had designated in opposition to the motions for summary judgment. The Court of Appeals affirmed summary judgment for both Solar and Daniels on the Vaughns' negligence claims and reversed the summary judgment for Daniels on Stephen Vaughn's product liability claim. Vaughn v. Daniels Co., Inc., 777 N.E.2d 1110, 1139 (Ind. Ct. App. 2002).

## I. Solar's Motion to Strike Expert's Affidavit

At the outset we deal with Solar and Daniel's motions to strike portions of the affidavit of David MacCollum which the Vaughns designated in response to the defendants' motions for summary judgment. The trial court admitted all of the designated evidence except paragraph 17 of MacCollum's affidavit.

Daniels and Solar assert that MacCollum's affidavit relied on two documents that constitute hearsay and are not self-authenticating. MacCollum states that he reviewed the documents entitled "Design, Procurement, and Construction of the Cannelburg Preparation Plant for Solar Sources, Inc."[2] and "Defendant Daniels Health and Safety Policy" and that these documents are "the type of information normally relied upon by me in the field of my experience in providing opinions." Indiana Trial Rule 56(E) provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall
> set forth such facts as would be admissible in evidence, and shall show affirma-

---

[2] No formal contract was ever executed between Daniels and Solar. The arrangement was documented in this proposal by Daniels.

tively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies not previously self-authenticated of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Indiana Evidence Rule 703 provides that: "Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field." The defendants do not challenge MacCollum's professional credentials and do not claim that these documents are not of the type reasonably relied upon by experts in the field. Accordingly, under Rule 703, the contested documents may be used by MacCollum in forming his opinions whether or not the documents are themselves admissible evidence.

Solar and Daniels also challenge MacCollum's affidavit on the ground that it contains inadmissible legal conclusions. Indiana Evidence Rule 704 permits opinions to embrace ultimate issues to be decided by the trier of fact, but prohibits opinions as to legal conclusions. MacCollum's opinions concerning engineering standards, procedures, and the design of the coal sump and facility are based on his expertise and are permitted by Evidence Rule 704. His opinions concerning reasonable care or proximate cause in paragraph 17 embrace ultimate issues to be decided by the trier of fact and therefore are admissible.[3] See Rhodes v. Wright, 805 N.E.2d 382, 388 (Ind. 2004) (the issue of proximate cause "is one usually left to the jury"); Stephenson v. Ledbetter, 596 N.E.2d 1369, 1372 (Ind. 1992) ("Whether a particular act or omission is a breach of a duty is generally a question of fact.").

Solar and Daniels also contend that the opinions expressed by MacCollum lack foundation because he did not view the plant and reviewed only the documents setting forth Daniels's proposal. Hands-on experience, formal education, specialized training, study of textbooks, performing experiments and observation can provide the foundation for an expert's opinion. See Summit Bank v. Panos, 570 N.E.2d 960, 965 (Ind. Ct. App. 1991), trans. denied (citing 13 W. Miller, Indiana Practice § 702.103, at 35-37 (1984)). Moreover, although Trial Rule 56(E) man-

---

[3] Paragraph 17 provides:

> 17. Based upon my engineering and construction management expertise and review of the documents listed above, it is my opinion Defendant Solar as owner of the property in question failed to use reasonable care by not requiring and/or participating in a construction management plan and/or a process of plant assembly plan for the design of the Cannelburg Project. Failure to use such reasonable care proximately resulted in injury to Mr. Vaughn.

dates that affidavits be made on personal knowledge, this does not mean that an expert must obtain his knowledge based solely on first-hand experience. See Bunch v. Tiwari, 711 N.E.2d 844, 849 (Ind. Ct. App. 1999). MacCollum stated that his opinions were based on his engineering and construction management expertise and review of the documents setting forth Daniels's proposal. We conclude that MacCollum's prior experience and review of these documents provided a sufficient foundation and that it was not necessary for MacCollum to have seen the sump in person for him to render an expert opinion. We therefore conclude that the trial court erred in striking paragraph 17 of MacCollum's affidavit but correctly admitted the remaining portions of it.

## II. Standard of Review

Summary judgment is appropriate when the designated evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); see also Meridian Mut. Ins. Co. v. Auto-Owners Ins. Co., 698 N.E.2d 770, 773 (Ind. 1998). Although the Vaughns have the burden of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the Vaughns were not improperly denied their day in court. Erie Ins. Co. v. George, 681 N.E.2d 183, 186 (Ind. 1997). All facts and reasonable inferences drawn from those facts are construed in favor of the Vaughns. Foster v. Auto-Owners Ins. Co., 703 N.E.2d 657, 659 (Ind. 1998); Wright v. Carter, 622 N.E.2d 170, 171 (Ind. 1993).

## III. The Strict Liability Claim

The complaint asserts a strict liability claim against Daniels under the Indiana Products Liability Act, Indiana Code sections 34-20-1-1 through 34-20-9-1. The trial court determined that Vaughn was neither a "user" nor a "consumer" as those terms are defined in the Act, and therefore had no claim under the PLA. We agree. Section 34-20-1-1[4] provides:

> This article governs all actions that are:
> (1) brought by a user or consumer;

---

[4] At the time this cause of action arose, the relevant provisions of the PLA were codified at Indiana Code sections 33-1-1.5-1 to 33-1-1.5-10. In 1998 the PLA was recodified at Indiana Code sections 34-20-1-1 to 9-1. See Pub. L. No. 1-1998, § 15, 1998 Ind. ALS 1, *15.

(2) against a manufacturer or seller; and

(3) for physical harm caused by a product;
   regardless of the substantive legal theory or theories upon which the action is brought.

Indiana Code section 34-20-2-1 sets forth the requirements of a strict liability claim governed by the PLA. It provides:

[A] person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user's or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if:

   (1) that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition;

   (2) the seller is engaged in the business of selling the product; and

   (3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which the product is sold by the person sought to be held liable under this article.

I.C. § 34-20-2-1. The Act defines a "consumer" as:

(1) a purchaser;
(2) any individual who uses or consumes the product;
(3) any other person who, while acting for or on behalf of the injured party, was in possession and control of the product in question; or
(4) any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use.

I.C. § 34-6-2-29. Indiana Code section 34-6-2-147 provides that "user" has the same meaning as "consumer" for purposes of the PLA. Vaughn was plainly not the "purchaser" of the coal sump and he was the injured party, not someone "acting for or on behalf of the injured party." Thus, Vaughn must be either an "individual who uses or consumes the product" under subsection (2) or a bystander reasonably "expected to be in the vicinity of the product during its reasonably expected use" under subsection (4).

Daniels argues that Vaughn cannot be considered a "user" of the coal sump because Daniels had a contractual obligation to assemble and install the sump before delivery to Solar. Accordingly, Daniels argues that at the time of Vaughn's injury, the pump could not and did not

6

"reach the user or consumer [Solar] without substantial alteration in the condition in which the product is sold by the person sought to be held liable." See I.C. § 34-20-2-1(3). Daniels argues that Solar is the statutory "purchaser," and can become a "user" of the sump only when assembly and installation was complete. We agree that the critical fact here is that Solar had ordered an assembled and constructed plant, and had expressly contracted to have Daniels perform the tasks necessary to provide the assembled and installed product.

Vaughn contends that "use" of a product can encompass installation or assembly. We agree that this is true of a product that is to be delivered to the ultimate purchaser in an unassembled state. But here the arrangement called for the manufacturer (Daniels) to install and assemble the product on the purchaser's (Solar's) premises. Trimble, as the entity employed by Daniels to accomplish that, and Vaughn, as Trimble's employee, were not yet dealing with the product that Solar had agreed to purchase. For that reason, neither Vaughn nor anyone else was a user of the product at the time it was still in the process of assembly and installation. As explained below, we think this conclusion is consistent with case law in this and other jurisdictions and with the structure of the PLA.

We do not agree with Daniels that assembly and installation can never constitute use. Daniels cites Wingett v. Teledyne Indus., Inc., 479 N.E.2d 51 (Ind. 1985), to support the proposition that assembly and installation are not "use" of a product. In Wingett the owner of a foundry hired an independent contractor to remove the foundry's existing ductwork. Id. at 53. An employee of the independent contractor, who was injured in the course of the removal effort, brought a products liability action against the manufacturer and installer of the ductwork. Id. at 54. This Court affirmed the trial court's grant of summary judgment to the installer and manufacturer on the ground that a person who dismantles or demolishes a product is not a "user" or "consumer" under the PLA. Id. at 55-56. Since Wingett was decided, however, we have held that the intended use of a product includes foreseeable maintenance and clean-up activities. Butler v. City of Peru, 733 N.E.2d 912 (Ind. 2000) addressed a claim by a school maintenance worker electrocuted while attempting to fix the school's electrical transmission system. We held that the maintenance worker, as an employee of the final purchaser of the transmission system was a "user" or "consumer." Id. at 919. We recently made explicit that "the assumption that

7

maintenance may be a part of a product's reasonably expected use" was "implicit" in the <u>Butler</u> holding. <u>Stegemoller v. ACandS, Inc.</u>, 767 N.E.2d 974, 976 (Ind. 2002).

We believe that assembly or installation, like maintenance, can also constitute "use" for these purposes. The Restatement (Second) of Torts first adopted strict liability in tort for defective products in section 402A in 1965.[5] In the twenty years following the publishing of the Restatement, a majority of jurisdictions, including Indiana, adopted section 402A, as a common law rule. When the Indiana legislature first addressed the issue in legislation in 1978, the Strict Products Liability Act, Indiana Code sections 33-1-1.5-1 through 33-1-1.5-8, incorporated section 402A of the Restatement Second nearly verbatim.[6] Comment l to section 402A states that "users" of products include "those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are utilizing it for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased." Comment l also states that "consumers" include "not only those who in fact consume the product, but also those who prepare it for consumption" and that "consumption includes all ultimate uses for which the product is intended." Comment d is consistent with this view, stating that the rule of strict liability in section

---

[5] Section 402A provides as follows:

Special Liability of Seller of Product for Physical Harm to User or Consumer
(1) One who sells any product in defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
  (a) the seller is engaged in the business of selling such a product, and
  (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
  (a) the seller has exercised all possible care in the preparation and sale of his product, and
  (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

<u>Restatement (Second) of Torts</u> § 402A (1965).

[6] In 1998 the ALI published the Restatement (Third) of Torts with new provisions governing products liability. The Restatement Third does away with the "user" and "consumer" language and would allow any "person" harmed by a defective product to be a proper plaintiff. It provides:

Liability of Commercial Seller or Distributor for Harm Caused by Defective Products
One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.

<u>Restatement (Third) of Torts:  Products Liability</u> § 1 (1998).  Indiana has not adopted this provision of the Restatement Third.

402A "extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer." As these comments show, the Restatement Second was understood to include ordinary maintenance and repair as "use" of a product,[7] and also supported the conclusion that the intended use of a product includes installation and assembly where a manufacturer expects a product to reach the ultimate user or consumer in an unassembled or uninstalled form.

We therefore agree with Vaughn that use and consumption may include assembly and installation of a product, but only if the product is "expected to reach the ultimate user or consumer" in an unassembled or uninstalled form.[8] The product in this case was not to be delivered uninstalled or unassembled. Rather, Daniels contracted to provide the plant, including the sump, in completed status. Vaughn was injured in the course of preparing the product for transfer to

---

[7] Jurisdictions that have adopted the Restatement Second approach have also concluded that "use" includes repair and maintenance. See, e.g., Skarski v. Ace-Chicago Great Dane Corp., 485 N.E.2d 1312, 1317 (Ill. App. Ct. 1985) (A dealer and distributor of trailers bought a trailer equipped with a refrigeration unit for the purpose of resale. The plaintiff, a repairman employed by the retailer who sold the refrigeration unit contained in the trailer, was injured while repairing the refrigeration unit which was under a manufacturer's warranty. The plaintiff sued the trailer dealer and the court rejected the trailer dealer's argument that a repairman was categorically not a user of the trailer.); Curcio v. Caterpillar Inc., 543 S.E.2d 264, 267 n.5 (S.C. Ct. App. 2001), rev'd on other grounds, 585 S.E.2d 272 (S.C. 2003) (Repairman killed while repairing heavy machinery for the purchaser sued the manufacturer under a theory of strict liability in tort. The court held the repairman was a "user" of the machinery "in the sense that he was 'utilizing it for the purpose of doing work upon it'" (quoting Restatement (Second) of Torts § 402A cmt. l)); Hamilton v. Motor Coach Indus., Inc., 569 S.W.2d 575, 576 (Tex. App. 1978) (The plaintiff, a mechanic who was injured while repairing an air cylinder on behalf of the air cylinder purchaser, brought a products liability action against the manufacturer-seller of the cylinder. The court found that the manufacturer "expected the air cylinder to undergo change from its use; that the cylinder would need servicing . . . and that it could be expected that the cylinder might be serviced by untrained or uninformed workmen." Accordingly, the court concluded that a "user" of the air cylinder, under the definition set forth in section 402A comment l, included a mechanic utilizing the cylinder for the purpose of doing work upon it for the ultimate buyer.).

[8] Accord Kaneko v. Hilo Coast Processing, 654 P.2d 343, 350 (Haw. 1982) (Purchaser seeking to erect new buildings at its mill site hired an architectural firm to design the buildings. After the designs were drafted, a welding company manufactured the mill building. The plaintiff's employer was hired to assemble the prefabricated building. The plaintiff, an ironworker, was injured in the course of assembling the prefabricated building and sued the manufacturer. The manufacturer argued that a prefabricated building is not a "product." The court held that "a prefabricated building that must be assembled is a product where the seller-manufacturer may be found strictly liable for injuries caused by a defective component part."); Anunziato v. Kar Grabber Mfg. Co., Inc., 748 N.Y.S.2d 404, 405 (N.Y. App. Div. 2002) (A plaintiff injured when an automobile straightening machine fell and struck his foot while it was being installed in the plaintiff's auto body shop sued the machine's manufacturer for strict liability in tort. The court stated that the manufacturer's contention that the claim does not lie as a matter of law "because the alleged injuries occurred during the installation process is without merit.").

Solar. He was an employee of an entity to whom Daniels had delegated the task of assembling the product. As such, he is in the same position as an employee of Daniels itself, and has no PLA claim as the user or consumer of a product not yet in the hands of its buyer.

We base our conclusion largely on the statutory framework of Indiana's PLA and the legislative and judicial history explained above. We note, however, that a majority of other courts, including the Seventh Circuit applying Indiana law, have concluded that a products liability claim does not lie where the manufacturer has not completed its obligation to install or assemble the product[9] but is available where the purchaser is required to install or assemble it.[10] Our conclusion is also consistent with the Court of Appeals's view of the requirement that the product must have been "sold" to "a first consuming entity" at the time of the plaintiff's injury. See Thiele v. Faygo Beverage, Inc., 489 N.E.2d 562, 588 (Ind. Ct. App. 1986), trans. denied. Thiele held that "users" or "consumers" under the PLA are limited to those "who might forseeably be harmed by a product *at or after* the point of its retail sale or equivalent transaction" to "a member of the consuming public." Id. at 586. (emphasis in original). Under this analysis, the contract between Daniels and Solar for Daniels to design, install and construct a coal preparation plant, including a heavy media coal sump, was a transaction "equivalent" to a "retail sale" because it

---

[9] In Ettinger v. Triangle-Pac. Corp., 799 A.2d 95, 98-100 (Pa. Super. Ct. 2000), a kitchen cabinet manufacturer contracted for the purchase of a furniture finishing system to be assembled on the purchaser's site by the seller's subcontractor. The court granted summary judgment for the seller against an employee of the subcontractor who was injured in the installation process on the ground that the oven had not left the seller's control: "Although the component parts of the oven had left [the seller's] manufacturing plant and were being assembled on [the purchaser's] property, they had not left the seller's possession, as [the seller] indisputably retained the obligation to assemble the component parts and deliver a fully-assembled oven." Id. at 104-05.

[10] In Lantis v. Astec Indus., Inc., 648 F.2d 1118, 1121-22 (7th Cir. 1981), the Seventh Circuit concluded that an employee of the purchaser injured during the course of assembly of an unassembled product had stated a claim under Indiana law where the manufacturer supplied an unassembled product for assembly by the purchaser. See also Kaneko, 654 P.2d at 350 (holding that "a prefabricated building that must be assembled is a product where the seller-manufacturer may be found strictly liable for injuries caused by a defective component part."); but see Hergeth, Inc. v. Green, 733 S.W.2d 409, 412 (Ark. 1987) (Manufacturer of flock feeder machine contracted to sell a flock feeder to a final purchaser. As a condition of the purchase contract, the manufacturer was to supply the manufacturer's employees to oversee installation and start-up of the feeder. The plaintiff was employed by the manufacturer and was injured during the course of installation. The plaintiff sued the manufacturer under Arkansas' Products Liability Act. The court held that the plaintiff had stated a cognizable claim, holding that Arkansas' "products liability statute clearly contemplates that a manufacturer may be responsible for injuries resulting from defective manufacture as well as injuries arising out of the erection and assembly of the product.").

lodged the product with the buyer. A PLA claim thus requires that the product be in the final state called for by the arrangement between the buyer and the seller.

In sum, at the time of Vaughn's injury, Daniels remained obligated to assemble and install the sump. Daniels engaged Trimble to install and assemble the product, and therefore Vaughn was acting on Daniel's behalf rather than on behalf of Solar at the time of the injury. As a result, Vaughn could not be a "user" or a "consumer" of the yet undelivered product. Moreover, Vaughn was also not a "bystander," because a bystander is one who is injured "in the vicinity of the product during its reasonably expected use." We think "use" of the product occurs only after it is delivered in the state contemplated by the arrangement between the seller and buyer. We thus affirm the trial court's finding that Vaughn was not a "user" or "consumer" under Indiana Code section 34-6-2-29.

### IV. The Vaughns' Negligence Claims

In order to recover on a common law negligence claim, the plaintiff must establish a duty on the part of the defendant to conform his conduct to a standard of care arising out of his relationship with the plaintiff, a failure on the part of the defendant to conform his conduct to the requisite standard of care, and an injury to the plaintiff that is proximately caused by the breach. See Franklin v. Benock, 722 N.E.2d 874, 878 (Ind. Ct. App. 2000), trans. denied. Absent a duty, there can be no breach, and therefore, no recovery for the plaintiff in negligence. Hopper v. Colonial Motel Prop., Inc., 762 N.E.2d 181, 188 (Ind. Ct. App. 2002), trans. denied. The issue is whether either Daniels or Solar owed a duty to Vaughn, and if so, what that duty entailed.

A. *Negligence Claim Against Solar*

Solar was the purchaser of the facility to be designed and furnished by Daniels and installed by Trimble. It is undisputed that Solar contracted with Daniels for the design and construction of the coal plant and Solar's only obligation was to fund the project.[11] The acts of negligence alleged are in the design and manufacture by Daniels, which was admittedly an independent contractor of Solar. The Vaughns assert that Solar is liable for Daniels's negligence un-

---

[11] The Vaughns assert that Solar had contractual duties to oversee safety operations at the worksite. The designated evidence does not support this assertion.

der an exception to the general rule that a principal is not liable for the negligence of an independent contractor. We have previously held that:

> [T]he long-standing general rule has been that a principal is not liable for the negligence of an independent contractor. However, five exceptions have been recognized for more than half a century. The exceptions are: (1) where the contract requires the performance of intrinsically dangerous work; (2) where the principal is by law or contract charged with performing the specific duty; (3) where the act will create a nuisance; (4) where the act to be performed will probably cause injury to others unless due precaution is taken; and (5) where the act to be performed is illegal.

Bagley v. Insight Commc'ns, Co., 658 N.E.2d 584, 586 (Ind. 1995) (internal citations omitted); see also PSI Energy, Inc. v. Roberts, 829 N.E.2d 943, 950 (Ind. 2005). The Vaughns cite the second exception, contending that specific duties are imposed by law under the Federal Mine Safety and Health Act of 1977 ("FMSHA"), 30 U.S.C. §§ 801 et seq. (2002). Specifically, the Vaughns maintain that under FMSHA regulations Solar and Daniels owed a duty to provide a railing around the coal sump.[12]

The Vaughns are correct that Solar as owner and Daniels as contractor are both subject to FMSHA regulations. Bituminous Coal Operators' Ass'n v. Sec'y of Interior, 547 F.2d 240, 246-47 (4th Cir. 1977). The FMSHA authorizes the Secretary of Labor to inspect mining operations and impose civil penalties for FMSHA violations. 30 U.S.C. §§ 802, 813-14, 819-20. Bituminous expressly left open the question of allocation of liability for fines as between the owner and an independent contractor, but that case did not address civil tort liability. It does not support the Vaughns' contention that a FMSHA regulation imposes a state law duty for purposes of tort liability of the owner for negligence of an independent contractor. For these purposes, FMSHA regulations are analogous to OSHA regulations applicable to many workplaces. An OSHA violation does not in itself render a workplace owner liable in tort for the negligence of an independent contractor. See Ellis v. Chase Commc'ns, Inc., 63 F.3d 473, 478 (6th Cir. 1995) (holding in a suit against the owner of premises where employee of independent contractor was killed

---

[12] In support of this argument, the Vaughns cite a mandatory safety standard which requires "Openings . . . through which men or material may fall shall be protected by railings, barriers, covers or other protective devices." 30 C.F.R. § 77.204 (2005). In view of our conclusion that FMSHA regulations do not impose a state law duty, we need not resolve whether the regulation requiring protective devices around "openings" applies to a fall over the side of the sump.

that even had there been a violation of OSHA safety regulations, the owner must owe a duty independent of OSHA in order to create liability). None of the remaining exceptions to the rule that a principal is not liable for an independent contractor's negligence are applicable. Accordingly, the trial court properly granted summary judgment in favor of Solar on the negligence claim.

B. *Negligence Claims Against Daniels*

The Vaughns' remaining negligence claims are against Daniels, the designer of the coal sump and coal preparation plant. Specifically, the Vaughns allege: (1) Daniels negligently designed and manufactured the Cannelburg plant rendering the installation of the coal sump inherently dangerous, (2) Daniels designed and manufactured a defective coal sump constituting a latent danger in the use of the product, and (3) Daniels maintained the property in an unreasonably safe condition. Until 1995, the Products Liability Act did not generally displace products liability law except for strict liability claims. See former I.C. § 33-1-1.5-1 (the PLA "governs all actions in which the theory of liability is strict liability in tort."). In 1995 that section of the PLA was amended to provide that it applied to all claims of defective products against a "manufacturer" by a "user or consumer" regardless of the theory of liability. I.C. § 34-20-1-1. As a result, the PLA now applies to all negligence claims brought against a "manufacturer" of a defective product by a "user" or "consumer." The PLA is explicit that it does not govern other claims: "This article shall not be construed to limit any other action from being brought against a seller of a product." I.C. § 34-20-1-2. For the reasons given in Part III, Vaughn is not a "user" or "consumer" and therefore the Vaughns' negligence claims are governed by conventional common law negligence doctrines, not by the PLA.

The Vaughns first argue that Daniels assumed a duty for the design safety of the construction site. Whether a party has assumed a duty and the extent of that duty, if any, are questions for the trier of fact. Perry v. N. Ind. Pub. Serv. Co., 433 N.E.2d 44, 50 (Ind. Ct. App. 1982), trans. denied. The Vaughns argue that Daniels's "Health and Safety Policy" establishes an issue of material fact relevant to assumption of duty because it states "Handrail, mid-rail, and toe boards must be used" on any scaffolding and it requires Daniels's employees to conduct daily, weekly, and periodic inspections. The Vaughns do not designate any evidence establish-

13

ing that the Safety Policy applied to this project or that Daniels was operating under it in the construction of this plant.[13] The Vaughns also designated a number of daily field reports completed by Daniels's supervisors. These reports reference weather conditions, the number of employees, and issues pertaining to materials and progress on construction. There is no indication that Daniels's employees conducted safety inspections prior to completing the forms, and there are no notations relating to safety concerns. Daniels points to its contract with Trimble that explicitly imposes these duties on Trimble. In sum, the designated evidence failed to demonstrate that Daniels assumed a duty to supervise safety at the job site.

The Vaughns next argue that Daniels owed a contractual duty to Vaughn. The parties agree that there was no written contract between Solar and Daniels apart from the "Design, Procurement, and Construction Specification," which sets forth Daniels's proposal for the Cannelburg project. The Vaughns cite this document and MacCollum's opinion that Daniels failed to use reasonable care by failing to provide a construction management plant and/or process of plant assembly plan. The Vaughns argue that the terms and conditions of the arrangement between Solar and Daniels as they relate to the construction site and to Daniels's responsibilities are questions of fact for the jury to decide. We disagree. Any duties that Daniels had relating to safety arising from its implied contract with Solar were effectively transferred to Trimble in the written contract between Daniels and Trimble which provided that Trimble would comply with Daniels's safety policies and conduct weekly safety meetings, would follow all applicable public safety laws and would indemnify Solar and Daniels for losses arising from a failure to follow public safety laws. The Vaughns have designated nothing to raise an issue of fact to establish a contractual duty on the part of Daniels.

The Vaughns also bring a negligent design claim against Daniels. Whether the law recognizes any obligation on the part of Daniels to conform its conduct to a certain standard for the benefit of Vaughn is a question of law. Webb v. Jarvis, 575 N.E.2d 992, 995 (Ind. 1991). The relationship between Daniels and Vaughn was that of designer-seller of a product and an em-

---

[13] The document, dated 1989 and entitled "Daniels' Health and Safety Policy," states that its purpose is "to provide safety information for the design, construction, operation, and maintenance of The Daniels Co.'s preparation facilities." Daniels produced the document in response to the Vaughns' interrogatories and the document does not specify if it is in effect on all of Daniels's jobs and the extent to which it is to be implemented when subcontractors are involved.

14

ployee of the designer-seller's subcontractor who assembled and installed the product before delivery to the final purchaser. It was reasonably foreseeable that if Daniels did not use reasonable care to design a safe unassembled and uninstalled facility, those who handled it in the process of assembly and installation, including Vaughn, might be at risk of injury. There is no policy reason to immunize Daniels from liability to those who are injured as a result of negligent design. However, in addition to establishing the existence of a duty, in order to survive Daniels's motion for summary judgment, the Vaughns must also establish breach, causation and damages. The parties dispute whether Daniels's breached its duty and whether the alleged breach was the proximate cause of Vaughn's injuries. Because we find there are genuine issues of material fact on these issues, we conclude that the trial court erred in granting Daniels's motion for summary judgment on the Vaughns' negligent design claim. The trial court concluded that Vaughn misused the sump and that misuse proximately caused Vaughn's injuries. Daniels cites the affidavits of Trimble and Daniels's presidents in which the presidents state that the sump was not intended to be used as a construction platform. The Vaughns cite blueprints showing a ladder access into the sump and argue that these blueprints show that it was foreseeable that workers would be on the sump. Vaughn testified that he had worked on approximately twenty to twenty-five sumps and that the Daniels design was different in that there was no steel overhead from which supports could hold the pipe during installation. Vaughn also stated that the fine coal sump on the site had a handrail around the top. We agree with the Vaughns that these facts create an issue as to whether workers would be on the sump, whether Vaughn's manner of installing the pipe constituted misuse of the sump, and if so, whether that misuse was the proximate cause of Vaughn's injuries. Therefore, the trial court erred in granting summary judgment to Daniels on the basis of misuse.

The trial court also found summary judgment appropriate on the ground that Vaughn voluntarily incurred the risk of falling that came with not being properly tied off while working at heights. Incurred risk acts as a complete bar to liability with respect to negligence claims brought under the PLA. See I.C. § 34-20-6-3. But, as explained above, the Vaughns' negligence claim is not governed by the PLA and is subject to Indiana's Comparative Fault Act, Indiana Code sections 34-51-2-1 through 34-51-2-19. The relative contribution of Vaughn's fault, if any, and Daniels's negligent design, if any, are fact issues for trial. We therefore reverse the trial court's grant of summary judgment to Daniels on the Vaughns' negligent design claim.

15

## Conclusion

Transfer is granted. The trial court's grant of summary judgment to Solar is affirmed. The trial court's grant of summary judgment to Daniels on the Vaughns' negligent design claim is reversed. Its grant of summary judgment to Daniels on the Vaughns' other negligence claims and on Stephen Vaughn's strict liability claim is affirmed. This case is remanded to the trial court.

Shepard, C.J., and Sullivan, J., concur.

Dickson, J., dissents with separate opinion, in which Rucker, J., concurs.

16

**Dickson, Justice, dissenting.**

I dissent to express my strong disagreement with the Court's conclusion that a worker installing a defective and unreasonably dangerous product is deprived of the right to assert a strict liability claim under the Indiana Product Liability Act, Indiana Code § 34-20-2. The plaintiff, Stephen Vaughn, should be permitted to bring this strict liability action as a "user" or "consumer" under the Act.

The majority's reasoning is based upon its belief that a person should not be considered a "user" or "consumer" of a product under the Product Liability Act unless the product is "in the final state called for by the arrangement between the buyer and the seller." Slip opin at 11. I disagree. For purposes of the Act, the word "product" is defined to mean "any item or good that is personalty at the time it is conveyed by the seller to another party." Ind. Code § 34-6-2-114. And "convey" should be given its plain and ordinary meaning, "to take or carry from one place to another; transport." THE AMERICAN HERITAGE DICTIONARY 320 (2d ed. 1985) .

In this case, the Daniels Company, Inc. arranged the shipment of the allegedly defective sump to the premises of Solar Sources, Inc. for installation there by Trimble Engineers and Constructors, Inc. Applying these facts to the definition of "product," the uninstalled sump is an "item or good," and it was "personalty" at the time it was "conveyed" by Daniels to the Solar Sources site.

Using this application of the statutory definition of "product," I conclude that in shipping the sump for installation, Daniels was "a person who sells, leases, or otherwise puts into the stream of commerce any product," and that Vaughn was a "user or consumer," thus governed by the Product Liability Act, which provides in relevant part as follows:

> a person who . . . puts into the stream of commerce any product in a defective condition unreasonably dangerous to *any user or consumer* . . . is subject to liability for physical harm caused by that product to the *user or consumer* . . . if . . . that *user or consumer* is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition.

Ind. Code § 34-20-2-1 (formerly § 33-1-1.5-3) (emphasis added). On the date of Vaughn's worksite injuries, December 12, 1995, the phrase "user or consumer" was defined, in relevant part, to include "any individual who uses . . . the product . . . or any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use." Ind. Code § 34-6-2-29 (formerly § 33-1-1.5-2(1)).[1] The Act also states that Section 1, quoted above, "applies although . . . the user or consumer has not bought the product from or entered into any contractual relation with the seller." Ind. Code § 34-20-2-2(2) (formerly § 33-1-1.5-3). Giving fair and reasonable meaning to the plain language of these statutory provisions, it seems clear that Vaughn is entitled to the protection of the Act, certainly as a user and perhaps as a bystander.

In Stegemoller v. ACandS, Inc., 767 N.E.2d 974, 976 (Ind. 2002), we construed the Act to apply to a worker's spouse who contracted a disease from asbestos fibers brought home on the person and clothing of her husband. We emphasized consideration of the normal and reasonably expected use of the product and rejected the defendant's arguments that the spouse was not covered by the Act as "too narrow a view" and "not consistent with the Act." Id. Similarly, in Butler v. City of Peru, 733 N.E.2d 912, 919 (Ind. 2000), we found the Act could apply to a maintenance worker injured while attempting to repair a product, holding that he fell under the definition of "user or consumer."

After reviewing relevant Indiana appellate decisions, the Court of Appeals correctly concluded that Vaughn was entitled to pursue an action against Daniels under the Act. Noting our recent decisions, it held:

> It is a logical extension of the [S]upreme [C]ourt's analysis to include in the definition of user or consumer a person who is injured while installing a product. The installation of a product is the preparation of a product for safe operation, just as maintenance is in many cases. . . . The installation process was not only foreseeable but expected and routine . . . . If Vaughn was, in fact, injured by Daniels' defective product, it seems illogical that he would be precluded from pursuing a suit against Daniels simply because the sump was not completely installed when he was injured while trying to install it, particularly

---

[1] When the Act was recodified in 1998, the language previously used to define "user or consumer" was retained verbatim but rearranged, renumbered, and placed under the definition of "consumer," with a new separate definition of "user" as having "the same meaning as the term 'consumer,' which is set forth in section 29 of this chapter." Ind. Code § 34-6-2-147.

when the alleged defect affected his ability to install it safely.
777 N.E.2d at 1127-28. In my view, the Court of Appeals is exactly right.

Just like the worker's spouse in <u>Stegemoller</u> and the maintenance worker in <u>Butler</u>, Vaughn, as an installer of the product in this case, should be entitled to present a strict liability claim under the Product Liability Act. The coal sump manufacturer, Daniels, obviously knew that its product had to be installed and that the installation workers would be exposed to any product defects creating dangers in the installation process. I cannot join the Court in adopting a rule that protects manufacturers from full strict liability accountability under the Act for injuries caused by their defective and unreasonably dangerous products and sustained by the workers who install them.

I also disagree with the majority's conclusion finding Solar not liable despite the fact that Solar was charged with specific duties to provide certain railings under the Federal Mine Safety and Health Act of 1977.

For these reasons, I dissent and believe that this Court should reverse in all respects the trial court's grant of summary judgment to Daniels and Solar.

Rucker, J., concurs.