**Douglas W. TEITGE and Lesley Teitge, Appellants (Plaintiffs Below),**

v.

**REMY CONSTRUCTION COMPANY, INC., and Everett I. Brown Company, Appellees (Defendants Below).**

No. 64A03–8703–CV–79.

Court of Appeals of Indiana, Third District.

Aug. 9, 1988.

---

Daniel L. Bella, Merrillville, for appellant.

Robert P. Kennedy, Kathleen M. Maicher, Spangler Jennings Spangler & Dougherty, P.C., Merrillville, for appellee, Everett I. Brown. Co.

Michael J. Anderson, Edward N. Kalamaros & Associates P.C., South Bend, for appellee, Remy Const. Co., Inc.

STATON, Judge.

The Teitges appeal from judgments on the evidence entered in favor of the defendants, Remy Construction Company (Remy) and Everett I. Brown Company (Brown).[1] They raise three issues for our review, two of which are dispositive. Those issues are:

1. Whether Remy's contract with the project owner imposed upon Remy, one of several prime contractors, a duty to protect the safety of *all* employees on the construction site, including Douglas Teitge (Teitge), an

---

1. The judgments were entered following the presentation of the Teitges' case.

employee of another prime contractor.

2. Whether Brown, the architect, through its affirmative conduct, voluntarily assumed such a duty.

Affirmed.[2]

The Portage Township School System (Portage) contracted with several prime contractors to renovate one of its former high schools. Remy, one of those prime contractors, had contracted to perform, among other things, the carpentry and millwork. Teitge was employed by Eibel & Sons, another prime contractor, which had contracted to perform the mechanical work. The other prime contractors had contracted to perform, among other things, the electrical work, plumbing, masonry, and paving.

For about a week, Teitge and another employee of Eibel & Sons had been dismantling air conditioning units located upon the roof of the school. Teitge's co-worker would dismantle each unit by separating it into small sheets of metal with an acetylene torch; Teitge would then drag the pieces of metal to a salvage area.

There were approximately twenty-eight skylights located upon the roof. Each skylight was approximately two-feet wide by three-feet long and was covered by a domed lid. On the morning of May 13, 1981, Teitge was walking backward, dragging a piece of metal to a salvage area. He slipped on one of the skylights and fell through it, falling sixteen to eighteen feet into a classroom below. He landed on a concrete floor and suffered injury.

Each prime contractor who had entered into an agreement with Portage had the same basic contract. Each basic contract incorporated by reference a set of specifications drawn up by Brown. The specifications indicated some general conditions applicable to all of the prime contractors, but

also indicated, under a separate section for each prime contractor, that prime contractor's specific duties at the job site. There was no one "general contractor," responsible for overseeing the completion of the project.

▮▮▮▮ Upon review, we will adhere to the standard that judgment on the evidence is proper only where there is a lack of evidence of probative value upon one or more of the factual issues necessary to support a verdict, and no reasonable inference in favor of the plaintiff can be drawn from this evidence. *Dibortolo v. Metropolitan School Dist. of Washington Township* (1982), Ind.App., 440 N.E.2d 506, 508. The evidence must be viewed in the light most favorable to the non-moving party, and if there is any evidence of probative value or reasonable inference therefrom which supports the plaintiff's claim, or if the evidence conflicts such that reasonable minds might draw differing conclusions, judgment on the evidence is inappropriate. Only where the evidence is without conflict and susceptible to one inference in favor of the moving party should judgment on the evidence be rendered. *Id.*

### I.

### *Whether Remy owed Teitge a Duty of Care*

▮▮▮▮ The trial court ruled that Remy's contract with Portage did not impose upon Remy a duty to protect the safety of Teitge on the construction site.[3]

In interpreting a written contact, it is the duty of the trial court to interpret the contract so as to ascertain the intent of the parties. It must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting. *Jones v. City of Logansport* (1982), Ind.App., 436 N.E.2d

---

**2.** Since we have determined that neither defendant had such a duty, it is unnecessary for us to address the Teitges' third issue concerning breach of duty; namely, whether the unbarricaded skylights indeed constituted a safety hazard which should have been guarded against. It is only necessary for us to address those issues which are dispositive of the appeal. *Beird v.*

*Figg & Muller Engineers, Inc.* (1987), Ind.App., 516 N.E.2d 1114, 1116, *reh. denied.*

**3.** In a negligence action, the existence of a duty is a legal question to be determined by the court, not the jury. *Ind. State Highway Comm'n v. Daily Express, Inc.* (1987), Ind.App., 503 N.E.2d 1237, 1239.

1138, 1143, *trans. denied.* The meaning of a contract is to be determined from an examination of all its provisions, not from a consideration of individual words, phrases or even paragraphs read alone. *Id.*

The court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. *Id.* at 1144. If the contract is ambiguous or uncertain in its terms and if the meaning of the contract is to be determined by extrinsic evidence, its construction is a matter for the fact finder. If, however, as here, the ambiguity arises because of the language used in the contract and not because of extrinsic facts, then its construction is purely a question of law to be determined by the court. *Id.*

On appeal, we will independently evaluate a pure question of law, substituting our judgment for that of the trial court if necessary. *The Ohio Casualty Ins. Co. v. Ramsey* (1982), Ind.App., 439 N.E.2d 1162, 1165, *trans. denied.*

■ Teitge contends that Remy's contract with Portage did indeed impose upon Remy a duty to protect the safety of Teitge on the construction site. Teitge directs our attention to selected provisions of the contract; through this selective reading, he concludes Remy was required to install barricades around the skylights. When the complete contract is read, however, it is clear that Remy had no such duty.

Teitge first directs our attention to Paragraph 10 of the "General Conditions of the Contract," found in the specifications and addressed to all of the prime contractors. That provision states, in pertinent part:

"... The Contractor shall take all necessary precautions for the safety of employees on the work, and shall comply with all applicable provisions of Federal, State, and Municipal safety laws and building codes to prevent accidents or injury to persons on, about or adjacent to the premises where the work is being performed. He shall erect and properly maintain at all times, as required by the conditions and progress of the work, all necessary safeguards for the protection of workmen and the public and shall post danger signs warning against the hazards created by such features of construction as protruding nails, hoists, well holes, elevator hatchways, scaffolding, window openings, stairways and falling materials; and he shall designate a responsible member of his organization on the work whose duty shall be the prevention of accidents. The name and position of any person so designated shall be reported to the Architect by the Contractor.

The Contractor shall provide all barricades, scaffolding, and other means of protection as may be required to comply with OSHA, State Laws and Muncipal [sic] Ordinances, and to adequately safeguard property and persons. The enforcement of all of the above is the definite responsibility of the Contractor and he shall make every effort and safeguard to ascertain compliance with all of said rules and regulations...."

Teitge fails to show how this provision of the contract—applicable to each and every prime contractor on the construction site—imposes upon Remy, one prime contractor, *any* duty to Teitge, an employee of another prime contractor. Indeed, Paragraph 1(B) of the General Conditions makes it clear that the word "Contractor," when not further qualified, refers to all contractors on the site. Thus, here, the word "Contractor" does not refer only to Remy and, standing alone, we cannot conclude that this provision of the contract imposes upon each contractor a duty to protect all of the employees on the job site.

In fact, it makes no sense to conclude that the contractors were required to constantly inspect the work of the employees of all the other contractors, to supply their omissions, and to neutralize the dangerous effects of their negligent workmanship. It is more logical to conclude that each contractor was responsible for protecting its own employees during the performance of its portion of the contract. Otherwise, the cost of avoiding or insuring against such potential liability would be entirely out of proportion to anticipated profits for most,

if not all, of the contractors. Furthermore, chaos would reign supreme on any job where several contractors with divergent concepts of safety might take seriously their supposed duty to supervise the safety practices of themselves and each other. *See Wyler v. Lilly Varnish Co., Inc.* (1969), 146 Ind.App. 91, 252 N.E.2d 824, 834, *trans. denied.*

Such a chaotic result cannot reasonably be said to have been envisioned by the parties. Where one construction of a contract would make it unusual and extraordinary, but another, equally consistent with the language, would make it reasonable, just, and fair, the latter construction must prevail. *Thomas v. Hennes* (1922), 78 Ind. App. 275, 135 N.E. 392, 394.

Teitge next directs our attention to Paragraph 8 under Section 1(D) of the "General Requirements"—a group of provisions also addressed to all of the prime contractors. That paragraph states:

FIRST AID PERSONNEL: The General Contractor[4] shall ascertain that a registered first aid personnel [sic] is present at the Portage Middle School site during all working hours.

Teitge contends that this provision imposed upon Remy the duty to provide first aid personnel and further indicated its role as a safety provider. We agree that Remy had a duty to provide first aid personnel, but Teitge has failed to show how such a conclusion is relevant to this appeal. Teitge does not claim that Remy did not provide first aid personnel and does not show how his injuries were exacerbated by the absence of first aid personnel on the job site, if indeed such personnel were absent at the time of his fall and the absence contributed to the severity of his injuries.

Further, it appears that Remy was responsible for securing first aid providers precisely because of the nature of its responsibilities as a general "works" contractor. Remy was also responsible for securing temporary permits and licenses for all workers not involved in the mechanical, electrical, or plumbing trades. (See Paragraph 9 of the General Conditions.) Assigning Remy the job of procuring first aid providers—a relatively minor duty—could not reasonably have bestowed upon it the additional major responsibilities associated with protecting the safety of all employees during all phases of the project.

We now turn our attention to that portion of the specifications addressed solely to Remy. Paragraph 42(A) under Section 6(A), "Carpentry and Millwork," states:

A. Safety: This Contractor shall take all precautions necessary for the safety of personnel and property during the demolition and remodeling program. He shall comply with all provisions of all state and local codes and ordinances. He shall also protect all existing or new structures from damage of any kind or description during the completion of this portion of his contract. He shall provide shoring, sheeting, bracing, and all or any necessary items as required for the safety of the structure. He shall further protect all utility lines encountered during the demolition operations, and in case interruption of service becomes necessary, he shall notify the interested parties and the Architect in sufficient time to make the necessary provisions. Prior to the removal of any wall or portion thereof, this Contractor shall perform all necessary investigation to insure the safety of workers and the building structure.

This portion of the contract deals exclusively with carpentry and millwork—not with the mechanical or any other phase of the project. Carpentry work is a major component of any construction project. Remy's work would necessarily touch upon almost everything done at the construction site. Indeed, that is logically why this provision was inserted—to impose upon Remy a duty to insure safety whenever its performance required it to come into contact

---

4. Remy was referred to in the contract documents as the "general" contractor because it was the general "works" contractor, responsible for certain general work duties. Remy did not have supervisory control over the other contractors nor was it to oversee the completion of the project.

with school personnel, other workers, or completed structures. That sort of duty was already imposed upon all of the prime contractors under Paragraph 10 of the General Conditions. This provision is unique to Remy precisely because of Remy's unique role in the work. However, Remy's role did not encompass so much of the project that it would be required to protect the safety of everyone on the job site at all times. This accounts for much of the wording of this provision: "This Contractor shall take all precautions ... *during the demolition and remodeling program;*" "He shall also protect all ... *structures* from damages ... *during the completion of this portion of his contract;*" "*Prior to the removal of any wall....*" (Emphasis added.)

Teitge focuses on the first sentence of this provision to conclude that Remy had a duty to construct and place barricades around the skylights. That sentence reads: "This Contractor shall take *all precautions* necessary for the safety of personnel and property...." (Emphasis added.) However, as stated earlier, we are to interpret a contract by looking to all of its provisions, not just one sentence or even one paragraph in isolation. Indeed, if this provision was actually intended to impose a duty upon Remy to protect all of the employees on the project, several questions arise: (1) Why is the provision "buried" in Paragraph 42 of the Carpentry and Millwork section of the specifications? (2)

Why weren't the other contractors made aware of Remy's role in the general conditions portion of the specifications? (3) Why wasn't such a duty stated clearly and unequivocally so there would be no doubt respecting Remy's role in the project? [5]

Even if we were to determine that Remy *was* required to construct and place barricades around the skylights, nothing in this sentence or paragraph—indeed, nothing in the entire contract—required Remy to determine, without direction, what, if any, dangerous conditions existed or required Remy to take steps to remedy such conditions absent orders to do so. Further, nothing in the contract expressly stated that barricades were required to be built around the skylights and Teitge has not cited any rule, statute, or law which required barricades under the circumstances here. Finally, Teitge has not shown that the failure to provide barricades constituted negligence.[6]

Remy's basic contract with Portage required it to comply with all Indiana construction laws as well as the Occupational Safety and Health Act of 1970. Thus, Teitge's final contention is that Remy's failure to barricade the skylights constituted a violation of both state and federal law. However, Teitge has failed to cite what provisions of these laws were violated. Thus, he has waived this argument. Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).[7]

5. We note, too, that the specifications were prepared prior to bidding on the project. Burying a major component of such a role would not have been fair to the prospective bidders.

6. An expert testified that each skylight should have been able to withstand the weight of a person weighing 200 pounds. However, he did not indicate (1) how much Teitge weighed at the time of the accident; or (2) whether he was referring to standing or falling weight. In addition, he had not conducted any tests on the remaining skylights to see whether they could withstand such weight. He merely concluded they could not do so after observing two or three.

As stated in Footnote 2, we decline to *fully* address whether the failure to provide barricades indeed constituted negligence. We note the plaintiff's lack of evidence on this issue merely as a further reason to deny his claim on the issue of duty.

7. We did review both the Indiana Administrative Code and the Occupational Safety and Health Act of 1970, but did not find any provision to support Teitge's argument. In any event, 610 IAC 5-1-1(6) provides:

The prime contractor of a project shall be deemed as being responsible for compliance with the provisions of this Code. In the event there is more than one prime contractor on a project, each shall be responsible for compliance of this Code [610 IAC 5-1] *within the area of his jurisdiction.* (Emphasis added.)

And, 29 USCS § 654(a) provides:

Each *employer*—(1) shall furnish to each of his *employees* employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees. (Emphasis added.)

Teitge cites *Jones v. City of Logansport, supra,* and *Harris v. Kettelhut Construction, Inc.* (1984),

Therefore, because there is no evidence of probative value which supports Teitge's claim that Remy owed him a duty, the trial court did not err in entering judgment on the evidence in Remy's favor.

## II.

### *Whether Brown Owed Teitge a Duty of Care*

Portage contracted with Brown to provide architectural services on the project.[8] The project administrator for Brown was Joseph Power. His primary responsibility was to complete paperwork associated with the construction project. Part of his responsibility was to hold on-site progress and coordination meetings every two weeks. Prior to these meetings, he would meet with Portage and John Mullikin, the on-site supervisor for Brown. They would determine whether there were any problems that should be addressed at the meeting. He would then contact each contractor to see if the contractor had any problems. At each meeting, Power reiterated to contractors that each was responsible for the safety of its own employees.

Mullikin conducted daily on-site inspections. He was to see that the work complied with the contract documents. He was also to coordinate the work among the contractors.

On one occasion, Teitge and a fellow employee excavated a hole in a parking lot to do a pipe repair. Protective coating with a backing was applied to the pipe. When they finished the project, they left the paper backing in the hole. Mullikin requested that they go back and retrieve the paper from the hole.

On another occasion, Mullikin recommended a different procedure for safety reasons. Teitge and a fellow employee were knocking a small hole in a concrete wall. Mullikin suggested that Teitge wear safety glasses while hammering and that a

third man be positioned on the back side of the wall to prevent a piece of brick or block from hitting anyone passing by.

Teitge contends that, through its affirmative conduct, Brown voluntarily assumed a duty to protect his safety on the construction site. In support of his contention, he cites *Phillips v. United Engineers & Constructors, Inc.* (1986), Ind.App., 500 N.E.2d 1265; and *Plan–Tec, Inc. v. Wiggins* (1983), Ind.App., 443 N.E.2d 1212.

■ Whether a party has assumed a duty and the extent of that duty, if any, are questions for the trier of fact. *Perry v. Northern Ind. Pub. Serv. Co.* (1982), Ind.App., 433 N.E.2d 44, 50, *trans. denied.*

In *Plan–Tec*, Plan–Tec had not contractually agreed to provide for on-the-job safety. *Id.* at 1219. However, the facts which were found to be sufficient to present a jury question as to its assumption of that duty were as follows: Plan–Tec had appointed a safety director, initiated weekly safety meetings, and directed the contractors to observe certain safety precautions. *Id.* at 1220. In addition, the safety director inspected the scaffolding each morning. *Id.*

In *Phillips*, United had appointed a "safety coordinator." The coordinator held bi-weekly safety meetings for superintendents of the contractors at the construction site. He also conducted tours of the site during which he noted safety violations or unsafe practices, and thereupon wrote a speed letter advising the violator to remedy the problem. The coordinator also admitted that a portion of his responsibility was to "govern the safety of contractors." *Id.* at 1269. While there were several facts which militated against finding that United assumed a duty, the Court held that there were sufficient facts of probative value to present a jury question. *Id.*

■ Here, we agree with the trial court that there were insufficient facts to

---

Ind.App., 468 N.E.2d 1069, *trans. denied,* to buttress his arguments. However, in absence of a showing that Remy violated any safety regulation, these cases are not relevant. And, even if they were, they are not on point.

8. The trial court ruled that Brown's contract with Portage did not impose upon Brown a duty to protect the safety of Teitge on the construction site. In his brief, Teitge failed to address the contract issue, thus, he has waived any error. A.R. 8.3(A)(7).

present a jury question. Unlike Plan–Tec or United, Brown did not appoint a safety director or coordinator. At Brown's bi-weekly "progress and coordination" meet-ings, Power mentioned safety only to reit-erate that each contractor was responsible for the safety of its own employees. In addition, no safety inspections were con-ducted on a regular basis.

While there were two instances in which Mullikin, Brown's on-site supervisor, in-structed Teitge and a fellow employee to observe certain obvious safety practices, we fail to see how that conduct, in and of itself, would suddenly transform Brown's role from one as an on-site coordinator to one as an on-site babysitter. *See also Lu-kowski v. Vecta Educational Corp.* (1980), Ind.App., 401 N.E.2d 781, 785, *trans. de-nied;* and *Walters v. Kellam & Foley* (1977), 172 Ind.App. 207, 360 N.E.2d 199, 207–208, *trans. denied.*

Because there was insufficient evidence to present a jury question on this issue, the trial court did not err in entering judgment on the evidence in Brown's favor.

Affirmed.

HOFFMAN and BUCHANAN, JJ., concur.