**CAPITOL CONSTRUCTION SERVICES, INC.,**
Appellant,

v.

**Amy GRAY, as Personal Representative of the Estate of Clinton Gray, Deceased, Appellee,**

and

**All One, Inc., Appellee.**

No. 49A04–1005–CT–289.

Court of Appeals of Indiana.

Dec. 19, 2011.

---

Jane E. Malloy, William A. Ramsey, Steele, Ulmschneider & Malloy, L.L.P., Fort Wayne, IN, Attorneys for Appellant.

John P. Daly, Jr., Golitko & Daly, PC, Carmel, IN, Attorney for Appellee Amy Gray.

GARY L. SHAW, Skiles DeTrude, Indianapolis, IN, Attorney for Appellee All One, Inc.

## OPINION

BROWN, Judge.

In this consolidated, interlocutory appeal, Capitol Construction Services, Inc. ("Capitol") appeals the trial court's grant of partial summary judgment in favor of Amy Gray, as personal representative of the estate of Clinton Gray ("The Estate"). Additionally, Capitol appeals the court's denial of its cross-motion for summary judgment. Capitol raises three issues, which we consolidate and restate as:

I. Whether the court erred in granting The Estate's motion for partial summary judgment; and

II. Whether the court erred in denying Capitol's cross-motion for summary judgment.

We affirm.

The relevant facts as designated by the parties follow. On February 26, 2007, Capitol entered into a contract with Kroger Limited Partnership ("Kroger"), in which Capitol was to serve as the general contractor on a construction project and was to be paid a sum of $660,000. Capitol hired All One, Inc. ("All One") to serve as a subcontractor on the project performing electrical installation.[1] On May 21, 2007, Clinton, an employee of All One, was working on a portable ladder "testing electrical lines approximately 15 to 17 feet in the air," and was "trying to connect a series of temporary lights throughout the building." Appellant's Appendix at 180. While performing this work at that elevation, Clinton "came in contact with live electrical lines" and fell from his ladder, striking his head on the floor.[2] *Id.* at 51. Clinton died as a result of the fall. At the time of the fall, Capitol had one employee on site, Herschel Gant, who was serving as the jobsite superintendent.

On April 17, 2008, The Estate filed a complaint against Capitol alleging negligence. On July 31, 2008, Capitol filed its answer as well as a third party complaint against All One alleging breach of contract and indemnification. On August 17, 2009, The Estate filed a motion for partial summary judgment, brief in support, and designation of evidence, arguing that "[t]here are no genuine issues of material fact that CAPITOL, as the general contractor, owed CLINTON a non-delegable, contractual duty of safety on the jobsite." *Id.* at 44. On September 14, 2009, Capitol filed its response to plaintiff's motion for partial summary judgment and cross-motion for

---

**1.** As will be more fully addressed below, there is a disagreement between Capitol and All One (as well as The Estate) regarding the date that this agreement was memorialized in writing. We observe that the designated evidence contains one version of the subcontractor agreement dated April 1, 2007, as well as another version dated May 23, 2007.

**2.** The quoted text is taken from The Estate's brief in support of its motion for partial summary judgment, which relied upon its com-

plaint for the proposition. We note that the complaint was designated by both parties and that, in particular, the facts surrounding Clinton's fall are not contested. *See Lean v. Reed,* 876 N.E.2d 1104, 1106 n. 1 (Ind.2007) (addressing the grant of summary judgment and noting that certain facts were taken from the complaint which was designated by the movant pursuant to Trial Rule 56(C) and was not contested).

summary judgment, including a memorandum in support and a "designation of materials and statement ·of undisputed material facts," arguing that Capitol did not assume a duty of care "by exercising sufficient control. . . ." *Id.* at 273, 279.

On February 1, 2010, the court granted The Estate's motion for partial summary judgment. On June 21, 2010, the court denied Capitol's cross-motion for summary judgment. This court subsequently accepted appeals from both orders pursuant to Ind. Appellate Rule 14(B) and ordered the appeals consolidated.

## I.

■ The first issue is whether the court erred in granting The Estate's motion for partial summary judgment. Our standard of review for a trial court's grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.,* 756 N.E.2d 970, 973 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Id.* Our review of a summary judgment motion is limited to those materials designated to the trial court. *Id.* In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. *Catt v. Bd. of Comm'rs of Knox Cnty.,* 779 N.E.2d 1, 3 (Ind.2002).

A party moving for summary judgment bears the initial burden of showing no genuine issue of material fact and the appropriateness of judgment as a matter of law. *Monroe Guar. Ins. Co. v. Magwerks Corp.,* 829 N.E.2d 968, 975 (Ind.2005). If the movant fails to make this prima facie showing, then summary judgment is precluded regardless of whether the non-movant designates facts and evidence in response to the movant's motion. *Id.* Also, "[t]he fact that the parties made cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Stumpf v. Hagerman Const. Corp.,* 863 N.E.2d 871, 875 (Ind.Ct.App.2007) (quoting *Hartford Acc. & Indem. Co. v. Dana Corp.,* 690 N.E.2d 285, 291 (Ind.Ct.App. 1997), *trans. denied* ), *trans. denied.*

Capitol challenges the court's grant of partial summary judgment in which the court found that:

> [T]here is no genuine issue of material fact regarding the contractual nondelegable duty of [Capitol], and that, as a matter of law, [Capitol] assumed in its contract with [Kroger] a contractual nondelegable duty of safety to all employees at the subject construction project, including the employees of its subcontractors, and that [The Estate] is entitled to Partial Summary Judgment on the issue of [Capitol's] contractual nondelegable duty.

Appellant's Appendix at 13–14. Thus, this action sounds in negligence and specifically concerns the existence and possible delegation of a duty owed by Capitol to Clinton.[3] "Generally, whether a duty exists is a question of law for the court to decide."

---

**3.** Negligence is comprised of three elements: (1) a duty on the part of a defendant in relation to the plaintiff; (2) a failure on the part of the defendant to conform its conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff that was proximately caused by the defendant's breach. *Stumpf,* 863 N.E.2d at 875–876.

*Rhodes v. Wright,* 805 N.E.2d 382, 386 (Ind.2004) (citing *Hooks SuperX, Inc. v. McLaughlin,* 642 N.E.2d 514, 517 (Ind. 1994)).

Capitol argues that: (A) it did not owe a contractual duty of care to Clinton; and (B) even if a contractual duty of care existed by virtue of its contract with Kroger, Capitol delegated its duty of care to subcontractor All One. We address each of Capitol's arguments separately.

## A.  *Capitol's Duty of Care by Contract*

■   First, Capitol argues that it did not owe a duty of care to Clinton pursuant to its contract with Kroger.  Under Indiana common law, it is well established that an employer does not have a duty to supervise the work of an independent contractor to assure a safe workplace and consequently is not liable for the negligence of the independent contractor. *Stumpf,* 863 N.E.2d at 876.  "The rationale behind this rule is that 'a general contractor typically exercises little, if any, control over the means or manner of the work of its subcontractors, and requires only that the completed work meet the specifications of the owner in its contract with the general contractor.' "  *Id.* (quoting *Harris v. Kettelhut Constr., Inc.,* 468 N.E.2d 1069, 1072 (Ind.Ct.App.1984). *reh'g denied, trans. denied* ).

■   However, Indiana case law recognizes five clearly-delineated exceptions to this general rule: (1) where the contract requires the performance of intrinsically dangerous work; (2) where one party is by law or contract charged with performing the specific duty; (3) where the performance of the contracted act will create a nuisance; (4) where the act to be performed will probably cause injury to others unless due precaution is taken;  and (5) where the act to be performed is illegal. *Id.* (citing *Merrill v. Knauf Fiber Glass GmbH,* 771 N.E.2d 1258, 1267 (Ind.Ct.App. 2002) (citing *Hale v. R.R. Donnelley & Sons,* 729 N.E.2d 1025, 1027 (Ind.Ct.App. 2000), *reh'g denied, trans. denied* ), *trans. denied* ).

■   The court based its grant of partial summary judgment on the second exception, finding that the contract between Kroger and Capitol charged Capitol with a duty of safety for all employees of the project, including the employees of subcontractors.[4]  Thus, this issue requires us to interpret the contract.  "Interpretation of a written contract is achieved by ascertaining 'the intent of the parties at the time the contract was executed as disclosed by the language used to express their rights and duties.' "  *Id.* (quoting *Merrill,* 771 N.E.2d at 1268).  "We must look to the contract as a whole to determine if a party is charged with a duty of care pursuant to the contract."  *Id.* "We accept an interpretation of the contract that harmonizes its provisions."  *Id.* (citing *Teitge v. Remy Constr. Co.,* 526 N.E.2d 1008, 1009 (Ind.Ct. App.1988)).  "If a contract affirmatively evinces intent to assume a duty of care, actionable negligence may be predicated upon the contractual duty."  *Id.* (citing *Hale,* 729 N.E.2d at 1028).

In The Estate's brief in support of its partial summary judgment motion, it designated to the trial court the relevant provisions of the contract and made argument as follows:

> In Paragraph 6 of the CONTRACT, "The Contract Documents" are identified in pertinent part as follows:

---

4.   Indeed, The Estate concedes that the other four exceptions do not apply.  Appellant's Appendix at 41.

... **General Conditions of the Contract,** Roof Warranty, **Jobsite Safety Rules,** ... together with the Agreement, shall form the Contract as is hereto attached or herein repeated. (CONTRACT, ¶ 6) (Emphasis added).

Article 5 of the General Conditions requires CAPITOL to do the following:

**ARTICLE 5  LAWS, ORDINANCES, RULES AND REGULATIONS**

5.1  The Contractor shall comply with all laws, ordinances, rules and regulations bearing on the project.... The Contractor shall maintain physical conditions and employee performance on the jobsite during the course of construction *to conform with all local and federal laws, rules and regulations including those covered by the Occupational Safety and Health Act of 1970.*

(General Conditions, Article 5, ¶ 5.1) (Emphasis added).

The "Jobsite Safety Rules," portion of the CONTRACT again requires CAPITOL to comply with and enforce OSHA rules and regulations:

**1.1  General Rules**

B.  All OSHA standards applicable to the project, methods and locations must be followed. Any noticed infractions or violations of these standards will be brought to the attention of the person in charge for immediate correction.

("Jobsite Safety Rules," Part 1, Section 1.1(B)). Under Article 5 of the General Conditions and Section 1.1 of the "Jobsite Safety Rules," both incorporated into the CONTRACT, CAPITOL was required to maintain physical conditions and employee performance on the jobsite in conformity with all federal laws, rules and regulations, including OSHA regulations.

CAPITOL was required under the CONTRACT to be responsible for (and to) not only its own employees, but also for all acts and omission of any subcontractors and their employees. Article 15 of the General Conditions states:

**ARTICLE  15  RELATIONS  OF CONTRACTOR  AND  SUBCONTRACTOR**

15.1  The Contractor shall be as fully responsible for the acts and omissions of his subcontractors, and of persons either directly or indirectly employed by them, as he is for the acts and omissions of persons employed directly by him.

(General Conditions, Article 15, ¶ 15.1).

Through this paragraph, CAPITOL contractually agreed to ensure that all subcontractors and their employees were in compliance with all terms of the CONTRACT, including compliance with all federal laws, rules and regulations regarding safety.

Perhaps most importantly in this case, CAPITOL also contractually agreed to "provide and require" the use of fall protection for all subcontractors when working at a height in excess of six feet. Paragraph 7 of the CONTRACT ("FALL PROTECTION") requires the following from CAPITOL:

Contractor **shall provide and require** the use of conventional fall protection, i.e. personal fall arrest systems, safety net systems or guardrail systems as defined in 29 CFR 1926.502 when its **employees or subcontractors are performing construction work that is in excess of six feet above a lower level.**

(Emphasis added).

The significance of this "six-foot safety rule" is reflected in its re-statement in the "Jobsite Safety Rules". Part 1 of

the "Jobsite Safety Rules" requires CAPITOL to:

### 1.1 General Rules

C. Provide and require the use of conventional fall protection, i.e. personal fall arrest systems, safety net systems or guardrails systems as defined in 29[ ]CFR 1926.502 *when its employees are performing construction work that is in excess of six feet above a lower level.*

("Jobsite Safety Rules," ¶ 1.1(C)). According to these unequivocal provisions of the CONTRACT, fall protection was mandatory for all workers on the PROJECT who were working at a height of more than six feet. Through this language, CAPITOL was contractually bound to provide even greater protection than required by OSHA relative to fall protection. The CONTRACT obligated CAPITOL to "provide and require" fall protection at any time a worker on the PROJECT, was working at a height above six feet.

Appellant's Appendix at 48–50.

Capitol argues that the contract provisions "are insufficient to create a duty of care for the safety of" Clinton. Appellant's Brief at 10. Capitol argues that contract provisions requiring it "to follow State and Federal laws and safety regulations have been held insufficient to create a duty of safety," and that the contract's "reference to OSHA in no way alters this conclusion." *Id.* at 10–11. Capitol argues that the "provision requiring Capitol to be fully responsible for the acts and omissions of its subcontractors does not create a specific duty of safety," noting that it does not "use the word 'safety,'" and it "merely ensures that the work is completed according to Kroger's specifications." *Id.* at 12. Capitol asserts that "the provision is for Kroger's benefit, and has nothing to do with the safety of strangers to the" contract, such as Clinton. *Id.* at 13. Capitol argues that the "provision requiring [it] to provide effective supervision does not create a duty of safety" and cites to Indiana case law stating that "the mere fact that the contractor retains certain powers of inspection and supervision does not, in and of itself, establish a duty of care for the subcontractor's employees." *Id.* at 14 (quoting *England v. Fairfield Contracting, Inc.*, 908 N.E.2d 238, 243 (Ind.Ct.App. 2008)).

Capitol argues that the contract's "fall protection provision does not create a duty of safety" because Clinton "was not performing 'construction work' at the time of the accident," and "[n]o 'conventional fall protection' is required when working on a portable ladder." *Id.* at 14–15. Capitol also asserts that "because [Clinton] was not performing construction work and no conventional fall protection was required," even if the fall protection provision imposed a duty on Capitol, this court could find that, as a matter of law, Capitol did not breach its duty. *Id.* at 17 n. 12. Finally, Capitol argues that "[l]ooking at a contract as a whole means not only looking at what the contract says, but also looking at what the contract *does not* say," and that the contract here "does not say that Capitol was responsible for the safety of the subcontractors." *Id.* at 18. Capitol submits that "[w]hen such provisions appear, and *only when* such provisions appear, has this Court found that a duty of safety is created." *Id.*

The Estate argues that "the contractual provisions are very similar to those in *Stumpf*," and it suggests that therefore we should similarly find a contractual duty of care owed by Capitol. Appellee's Brief at 14. The Estate argues that this court in *Stumpf* also makes clear that "the contractual term 'employees' includes employees of subcontractors...." *Id.* (citing *Stumpf,*

863 N.E.2d at 878 (citing *Harris,* 468 N.E.2d at 1069)). The Estate argues that the contract's references to OSHA standards are a shorthand "for the appropriate duty of care ... which is to be performed," and Indiana case law has found this to be an appropriate method for contract drafting. *Id.* at 21 (citing *Jones v. City of Logansport,* 436 N.E.2d 1138, 1148 (Ind. Ct.App.1982). *reh'g denied* ).

The Estate also argues that Capitol expressly agreed to a heightened standard of care when it agreed to provide fall protection for any employee performing construction work at a height of six feet or above. The Estate argues that "[s]imply put, the contract requires that *any* time work is being performed over six feet, that the worker be protected from falling from [sic] by means of OSHA approved fall protection," and that as a consequence "18–foot ladders should not be used." *Id.* at 20. The Estate argues that "[s]imply using a scissor lift with guardrails would meet this requirement," and that it is not "asserting that [Clinton] should have fall protection on a ladder; [it is] asserting that he never should be working on an 18–foot ladder in the first place," and that "[t]his is the same factual pattern as *Stumpf,* which also involved a fall off a ladder at a construction site." *Id.* at 20–21.

Capitol argues in its reply brief that "[a] thorough analysis of the contractual language at issue in *Stumpf* demonstrates that the language in that case was so fundamentally different from the contractual language at issue here as to render the decision ... inapplicable to the case at bar." Reply Brief at 4.

In arguing that it did not agree to a duty of care in its contract with Kroger, Capitol cites to *England v. Fairfield Contracting.* In *England,* the principal and Fairfield Contracting, Inc. ("Fairfield"),

who was the general contractor, signed a contract containing three provisions relevant to the general contractor's obligations: "All work to be completed in a workmanlike manner according to standard practices;" "Contractor to provide competent on-site and in-house supervision to insure that the job progresses smoothly and meets or exceeds design criteria;" and "Contractor will provide all mobilization, field and main office supervision, all construction equipment, small tools and supplies." 908 N.E.2d at 240. England, who was an employee of a subcontractor hired by Fairfield, was severely and permanently injured on the jobsite when he fell from a scaffolding that "did not have any safety rails...." *Id.* At a hearing, England moved for partial summary judgment on the issue of whether Fairfield owed him a duty of safety by virtue of the contract which the trial court denied. *Id.* at 241. We affirmed, holding that the contract did not affirmatively evince the intent on the part of the contractor to assume a duty of care. *Id.* at 242–243.

In so holding, we noted that England conceded that the contract provisions were "ambiguous as to whether Fairfield assumed a duty of care to ensure that its subcontractors followed all safety rules," and insisted "that we should look to extrinsic evidence to interpret the Contract, including the testimony of two safety experts regarding the accepted meaning of this contractual language." *Id.* at 242. Based on this concession, we concluded that England implicitly conceded "that the document does not 'affirmatively evince' an intent that Fairfield assume a duty of care." *Id.* Also, we reasoned that even if England did not make such a concession, "it is evident that the document does not affirmatively, explicitly, or implicitly indicate that Fairfield assumed such a duty," because the contract did not "discuss safety,

OSHA, compliance with safety laws or building codes, or accident or injury prevention." *Id.*

In *Stumpf,* we concluded that a contract between the principal and Hagerman Construction Corporation ("Hagerman"), who was the general contractor, imposed a duty of care on Hagerman, and we held that the trial court erred in granting summary judgment in favor of Hagerman. 863 N.E.2d at 880. The contract, in paragraph twenty-four of the General Conditions, provided:

> The Contractor shall take all necessary precautions for the safety of employees on the work, and shall comply with all applicable provisions of Federal, State, and Municipal safety laws and building codes to prevent accidents or injury to persons on, about or adjacent to the premises where the work is being performed.... Contractor shall designate a responsible member of its organization on the work, whose duty shall be the prevention of accidents.

*Id.* at 877.

In interpreting this contract provision, we examined earlier cases from this court which similarly found the existence of a duty of care by virtue of contract. First, we turned to *Perryman v. Huber, Hunt & Nichols, Inc.,* 628 N.E.2d 1240 (Ind.Ct. App.1994), *trans. denied,* and we noted:

> The contract between the prime contractor, HHN, and the owner of the premises provided: "The Construction Manager [HHN] hereby agrees that it will comply with all applicable state and federal statutes and other governmental regulations pertaining to employment, and that it will require like compliance therewith from all Trade Contractors related to the Project." The contract also provided that HHN was responsible for reviewing the safety programs of its subcontractors and making recommendations.

*Stumpf,* 863 N.E.2d at 877 (quoting *Perryman,* 628 N.E.2d at 1244) (internal citation omitted).

Next, we examined *Harris v. Kettelhut Constr.,* and stated that the contract between the premises owner and the general contractor provided:

> The Contractor shall take all necessary precautions for the safety of all employees on the Project, and all other persons who may be affected thereby, and shall comply with all applicable provisions of the Contract Documents and Federal, state and municipal safety laws, building, mechanical and electrical codes and rules, regulations and restrictions to prevent accidents or injury to persons on, about or adjacent to the Project or elsewhere.

*Id.* at 877–878 (quoting *Harris,* 468 N.E.2d at 1072–1073). Additionally, the relevant contract provisions included the following:

> A.  Barricades and Obstruction Lights.
>
> 1.  Each Contractor shall provide and maintain adequate approved barricades around obstructions and excavations resulting from his work. Where these obstructions and excavations occur at any area crossed by the public or the owner's personnel, adequate approved warning lights shall be installed on the barricades. Entrances and accesses to the roadways or walks where these obstructions and excavations occur shall also be barricaded and lighted as specified above.
>
> B.  Guard Rails.
>
> 1.  Comply with recognized standards and code requirements for the erection of substantial and structurally adequate barricades and guardrails where needed to prevent accidents and losses. Paint with appropriate colors, graphics and warning signs to inform personnel at

site, and the general public where exposure exists, of hazard being protected. Provide lights where appropriate and needed for recognition of facilities including flashing red lights where appropriate.

*Harris,* 468 N.E.2d at 1073. As noted in *Stumpf,* this court in *Harris* held that contractor Kettelhut, "by virtue of its contract with [the premises owner], assumed a duty to maintain safety on the construction site for *all* employees," and also the *Harris* court found that the contract provisions extended that duty "to the installation of guardrails on roofing areas where the employees of [the subcontractor], including Harris, were working . . . ." *Id.; see also Stumpf,* 863 N.E.2d at 878.

We concluded in *Stumpf* that, similar to the contracts in *Perryman* and *Harris,* Paragraph twenty-four of the contract's General Conditions evinced "intent by the parties to charge Hagerman with a duty of care for the safety of all the employees on the project, including the employees of its subcontractors." 863 N.E.2d at 878. In so holding, we noted that all three contracts contain "similar language requiring the contractor to take precautions for the safety of employees on the work site." *Id.* We distinguished such contracts from the contract at issue in *Helms v. Carmel High Sch. Vocational Bldg.,* 844 N.E.2d 562 (Ind.Ct.App.2006), *aff'd in part by* 854 N.E.2d 345 (Ind.2006), in which we held that a contract "requiring the general contractor to ensure that its construction 'conform to all applicable laws of the State of Indiana' did not evince an intent that the general contractor had contracted to provide a safe worksite for its subcontractors." *Id.* (quoting *Helms,* 844 N.E.2d at 564). After distinguishing *Helms,* we concluded that:

> In the case at hand, by contrast, the language of the contract *specifically* as-

signs Hagerman the duty to provide for the safety of its employees and to prevent injury to employees. Furthermore, Hagerman contractually agreed to *administer* and comply with OSHA regulations. Hagerman was also contractually required to designate a member of its staff whose duty would be to prevent accidents.

*Id.*

Here, we find that the relevant contractual terms go beyond requiring that Capitol merely supervise the work of its employees and subcontractors, and instead they contain language requiring the contractor to take precautions for the safety of employees on the work site, thereby affirmatively evincing the intent on Capitol's part to assume a duty of care. Although Capitol insists that the contract does not explicitly state that Capitol is responsible for the safety of its employees and subcontractors, we find that the contract contained language similar to the contracts in *Harris, Perryman,* and *Stumpf.* Indeed, we note that the contract identifies as a part of the Contract Documents a set of "Jobsite Safety Rules" in which Capitol agreed to the following provisions:

1.1 General Rules

A. The Kroger Co. will not permit any person or organization to jeopardize the safety or well-being of any employee or invitee on Kroger premises because of the willful disregard or negligence of sound, established safety rules. All Federal, State, local, and OSHA safety rules are to be observed.

B. All OSHA standards applicable to the project, methods and locations must be followed. Any noticed infractions or violations of these standards will be brought to the attention of the person in charge for immediate correction.

C. Provide and require the use of conventional fall protection, i.e. personal fall arrest systems, safety net systems or guardrails systems as defined in 29 CFR 1926.502 when its employees are performing construction work that is in excess of six feet above a lower level.

Appellant's Appendix at 113. Capitol also agreed, in Article 5 of the contract's General Conditions, that it would "comply with all laws, ordinances, rules and regulations bearing on the project" and that it would "*maintain* physical conditions and employee performance on the jobsite during the course of construction to conform with all local and federal laws, rules and regulations including those covered by the Occupational Safety and Health Act of 1970." *Id.* at 99 (emphasis added). Thus, much like the general contractor in *Stumpf,* we find that Capitol agreed to comply with and administer the proper OSHA standards and that Capitol specifically agreed to be responsible for the safety of the jobsite employees.

Also, much like the contractor in *Harris,* Capitol agreed, in Paragraph 7 of the Agreement section of the contract, to provide and require a specific safety precaution at the jobsite in "the use of conventional fall protection," which includes "personal fall arrest systems, safety net systems or guardrail systems," for any "employees or subcontractors [ ] performing construction work that is in excess of six feet above a lower level." *Id.* at 96, 288. The specifications, as incorporated by Paragraph 7, are defined by 29 C.F.R. § 1926.502; § 1926.502(b) provides specifications for guardrail systems, § 1926.502(c) provides specifications for safety net systems, and § 1926.502(d) provides specifications for personal fall arrest systems. The significance to Kroger of Paragraph 7 was underscored in Part C of the Jobsite Safety Rules, in which this requirement was repeated almost verbatim. Clinton died when he fell from a portable ladder at a height of eighteen feet, and the designated evidence does not indicate that, at the time of this fall, he was utilizing a guardrail, safety net, or personal fall arrest system.[5]

5. To the extent that Capitol asserts in its brief that we should "find that because [Clinton] was not performing construction work and no conventional fall protection was required, Capitol did not breach its duty to provide conventional fall protection to those engaged in construction work," we note that it does not cite to authority for the proposition that we may rule on a different element of negligence upon a paper record prepared for deciding whether *partial* summary judgment was appropriate on *another* element. Unlike the cases relied upon by Capitol, here the parties' summary judgment motions did not concern breach and therefore evidence was not designated regarding the element of breach. *See Briesacher v. Specialized Restoration and Constr., Inc.,* 888 N.E.2d 188, 191 (Ind.Ct.App.2008) (noting that the trial court granted summary judgment because it found that the defendant did not owe a duty to the plaintiff, and that in so holding it did not reach the arguments related to the other elements); *Jones v. Ind. Bell Tel. Co.,* 864 N.E.2d 1125, 1127 (Ind.Ct.App.2007) (noting that the trial court granted judgment on the evidence at the conclusion of the plaintiff's case-in-chief based upon the plaintiff's failure to prove whether a common law duty existed); *Schoop's Rest. v. Hardy,* 863 N.E.2d 451, 456 (Ind.Ct.App.2007) (noting that the court erred in denying the defendant's motion for summary judgment because "[t]he only inference that can be drawn from [the] undisputed facts is that Schoop's Restaurant could not have foreseen this incident," and that therefore it "did not breach its duty to exercise reasonable care ...."). Thus, it would be improper for us to reach the question of whether Capitol breached its duty of safety.

Also, we note that, regarding Capitol's suggestion that it did not owe a duty to Clinton because he "was not performing 'construction work' at the time of the accident," due to our conclusion that Capitol owed Clinton a duty of safety, this argument is more properly ex-

We therefore conclude that these provisions, read together, specifically assigned Capitol a duty of care for the safety of Clinton.

amined in deciding whether Capitol breached its duty. However, we also note that Capitol's citations to authority regarding what constitutes "construction work" differentiate between purchasing land versus constructing upon land, rather than discussing whether work performed at a jobsite may be considered construction work. *See S. Ind. Ry. Co. v. Indianapolis & L. Ry. Co.*, 168 Ind. 360, 372, 81 N.E. 65 (1907) ("Construction is building. Building a road-constructing a road. This certainly does not include buying the ground on which to build and construct it. Buying a piece of ground is not a part of constructing a house."); *Ogilvie v. Steele by Steele*, 452 N.E.2d 167, 170 (Ind.Ct.App.1983) ("Chicago Railroad's lease with Conrail is not a 'construction contract' within IC 26–2–5–1. The crux of the lease is to authorize Chicago Railroad's use of Conrail's railroad tracks. It does not require Chicago Railroad to build anything in connection with its use of the tracks. Therefore, the lease is not a 'construction contract' pursuant to IC 26–2–5–1"); *Montgomery v. Bd. of Zoning Appeals of Lake Cnty.*, 135 Ind.App. 437, 442, 193 N.E.2d 142, 144 (1963) (*"Construction is building "*) (quoting *Lutz v. New Albany City Plan Comm'n*, 230 Ind. 74, 81, 101 N.E.2d 187, 190 (1951)).

Finally, to the extent that Capitol asserts that "[n]o 'conventional fall protection' is required when working on a portable ladder," we note that the contract specifically requires that Capitol provide workers performing construction work on the jobsite with conventional fall protection whenever they are working at a height in excess of six feet.

6. We note that Capitol has also filed a third party complaint against All One, Inc. ("All One"), which was the subcontractor employing Clinton on May 21, 2007, the date of his fatal injury, asking for damages "in the amount, if any, awarded against [Capitol] on [The Estate's] Complaint, together with attorney fees and expenses," based upon breach of contract and indemnification theories. Appellant's Appendix at 74. A final judgment has not been reached on Capitol's third party complaint and is not before this court on appeal.

## B. *Delegation of Capitol's Duty to All One by Subcontract*

■ Having determined that Capitol owed Clinton a duty of care, we next must determine whether Capitol delegated its duty to subcontractor All One.[6] Capitol

However, All One has filed a brief noting that it has "filed a counterclaim for declaratory judgment" regarding whether a written agreement existed on May 21, 2007, between Capitol and All One, and that "[t]hus, Capitol Construction's Statement of Facts regarding application of provisions of an alleged subcontract are incorrect." All One's Brief at 1. All One also filed an appendix containing its counterclaim. All One argues that "[t]he trial court below has not determined the nature of the contractual relationship between All One and [Capitol], if any," and that "the assumption that there was an agreement is inappropriate at this time and the Court of Appeals should not allow such a determination by implication creating the possibility of applying the doctrine of law of the case." *Id.* at 2. Specifically, All One takes exception to footnote 13 of Capitol's brief which states: "[The Estate] at one point argued, without support, that the Subcontract post-dated the accident. However, [The Estate] designated the Subcontract as being 'entered into ... on April 1, 2007,' before the accident. Therefore, the designated evidence is that the contract was entered into prior to the date of the accident." Appellant's Brief at 23 n.13; *see also* All One's Brief at 2–3. Capitol filed a separate reply brief in response to All One's brief and argues that "All One has waived all arguments raised in its Brief" because it "did not make these arguments to the Trial Court" and it "relies on documents that were never designated to the Trial Court." Capitol's Reply to All One at 1.

Initially, we note that Capitol is correct that All One's counterclaim for declaratory judgment was not properly designated and thus we may not consider this evidence. *See P.R. Mallory & Co., Inc. v. Am. Cas. Co. of Reading, PA.*, 920 N.E.2d 736, 755 (Ind.Ct.App.2010) ("Because the portion of the deposition relied upon by the Plaintiffs on appeal was not properly designated to the trial court, we cannot consider such evidence."), *trans. denied; see also* Ind. Trial Rule 56(C) ("At the time of filing the motion or response, a party shall designate to the court all parts of pleadings,

refers us to § 4.3.1 of the subcontract, which states:

> [All One] shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by [Capitol] and with applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons and property in accordance with the requirements of the Prime Contract. [All One] shall report to [Capitol] within three days an injury to an employee or agent of [All One] which occurred at the site.

Appellant's Appendix at 79.

Opinions of both the Indiana Supreme Court and this court have repeatedly stated that "[t]he duties associated with Indiana's five exceptions are considered non-delegable, and an employer will be liable for the negligence of the contractor, because the responsibilities are deemed 'so important to the community' that the employer should not be permitted to transfer these duties to another." *Bagley v. Insight Commc'ns Co., L.P.*, 658 N.E.2d 584, 587 (Ind.1995); *see also Stumpf*, 863 N.E.2d at 876–877; *Ryobi Die Casting v. Montgomery*, 705 N.E.2d 227, 229 (Ind.Ct.App. 1999), *trans. denied; Harris*, 468 N.E.2d at 1076–1077 (noting that even if the contract did not contain a nondelegation clause, any possible delegation by the defendant would not "relieve it of potential liability for failing to provide guardrails at the staging area") (citing *City of Anderson v. Fleming*, 160 Ind. 597, 67 N.E. 443 (1903) (holding that city remained jointly liable with a contractor for the injuries caused the plaintiff by the contractor's failure to fulfill its contractual duty to keep the sidewalks safe)); *see also England*, 908 N.E.2d at 243 ("[T]o the extent that the instruction implies that a duty of care is delegable, we note that the jury was explicitly instructed that if Fairfield retained control over the safety practices of its subcontractor or evinced an affirmative intent in a contract to do so, then Fairfield may be solely liable for a failure to adequately perform that duty."). The trial court similarly found that Capitol's duty was non-delegable.

Capitol argues, however, that the Indiana Supreme Court abrogated the nondelegability aspect of the five exceptions to the general common law rule in *Vaughn v. Daniels Co.*, 841 N.E.2d 1133 (Ind.2006), *reh'g denied.* Capitol, who at one point in its brief cites to this court's vacated *Vaughn* opinion, argues that Capitol "clearly assigned [All One] the duty of care for the safety of its employees" via the subcontract. Appellant's Brief at 24. Capitol also cites to numerous out-of-state cases and claims that each of these opinions "have interpreted the same or similar provisions and have uniformly held that

---

depositions, answers to interrogatories, admissions, matters of judicial notice, and any other matters on which it relies for purposes of the motion."). However, to the extent Capitol argues that the designated evidence does not provide support for All One's position, we note that the designated evidence contains multiple versions of the contract signed by Capitol and All One in which the date of the agreement appears to be the only differing item.

Thus, even were we to find that Capitol could have delegated its duty of care to All One, there is an underlying factual issue of whether a contractual relationship existed between Capitol and All One on May 21, 2007. *Rhodes*, 805 N.E.2d at 386 (citing *Douglass v. Irvin*, 549 N.E.2d 368, 369 n. 1 (Ind.1990) ("While it is clear that the trial court must determine if an existing relationship gives rise to a duty, it must also be noted that a factual question may be interwoven with the determination of the existence of a relationship, thus making the ultimate existence of a duty a mixed question of law and fact.") (quoting *Clyde E. Williams & Assocs. v. Boatman*, 176 Ind.App. 430, 435, 375 N.E.2d 1138, 1141 (1978))).

such language charges the subcontractor with the duty of safety." *Id.* Capitol also argues that "[f]inding that Capitol delegated the duty of safely performing electrical work to its electrical subcontractor not only is good law, but also is good policy." *Id.* at 25.

The crux of Capitol's argument, though, centers upon the following statement from the Indiana Supreme Court's decision in *Vaughn*:

> Any duties that Daniels [the general contractor] had relating to safety arising from its implied contract with Solar [the principal] were effectively transferred to Trimble [the subcontractor] in the written contract between Daniels and Trimble which provided that Trimble would comply with Daniels's safety policies and conduct weekly safety meetings, would follow all applicable public safety laws and would indemnify Solar and Daniels for losses arising from a failure to follow public safety laws.

841 N.E.2d at 1145.

In *Vaughn*, however, as indicated in the quotation above, "[n]o formal contract was ever executed between Daniels and Solar," and "[t]he arrangement was documented" by a proposal prepared by Daniels entitled "Design, Procurement, and Construction of the Cannelburg Preparation Plant for Solar Sources, Inc." *Id.* at 1137. Additionally, the Vaughns relied upon another document entitled "Defendant Daniels Health and Safety Policy," which was referenced

in an affidavit they designated. *Id.* To this end, the Court in *Vaughn* concluded that the five exceptions to the general rule that a contractor is not liable for the negligence of its subcontractors did not apply. Indeed, the Court's discussion of this issue was limited to a single paragraph in which it acknowledged that "[t]he parties agree that there was no written contract between Solar and Daniels," and states that, based upon Daniels's proposal, the Vaughns argued "that the terms and conditions of the arrangement between Solar and Daniels as they relate to the construction site and to Daniels's responsibilities are questions of fact for the jury to decide." *Id.* at 1145. After disagreeing with the Vaughns' contention and noting that any supposed duty of safety from the implied contract was delegated to subcontractor Trimble, the court concluded: "The Vaughns have designated nothing to raise an issue of fact to establish a contractual duty on the part of Daniels." [7] *Id.*

Simply put, we do not believe that the *Vaughn* Court, especially when viewed in the proper context, meant to abrogate well-established, long-standing Indiana precedent that duties assumed pursuant to the five exceptions are non-delegable because the responsibilities are deemed so important to the community that the party assuming such a duty should not be permitted to transfer those duties to another. Accordingly, we conclude that the court did not err in determining that Capitol's duty of safety was non-delegable.[8] *See*

---

7. The Vaughns also claimed negligence against Daniels by arguing "that Daniels's 'Health and Safety Policy' establishes an issue of material fact relevant to assumption of duty because it states 'Handrail, mid-rail, and toe boards must be used' on any scaffolding and it requires Daniels's employees to conduct daily, weekly, and periodic inspections," and that therefore Daniels "assumed a duty for the design safety of the construction site." *Vaughn*, 841 N.E.2d at 1144. The Court con-

cluded on this issue that "[t]he Vaughns do not designate any evidence establishing that the Safety Policy applied to this project or that Daniels was operating under it in the construction of this plant." *Id.* at 1144–1145.

8. Because we find that, as a matter of law, Capitol assumed a duty of care based upon its contract with Kroger, this renders moot the second issue raised by Capitol, namely, whether the court erred in denying Capitol's

*Helms,* 854 N.E.2d at 346 (citing *Bagley* with approval); *cf. Selby v. N. Ind. Pub. Serv. Co.,* 851 N.E.2d 333, 337–339 (Ind.Ct. App.2006) (examining the vitality of the intrinsically dangerous exception in *Bagley* after *Vaughn* and noting that "[d]uties associated with the five exceptions are considered non-delegable, and the principal is liable for the negligence of the contractor because the responsibilities are deemed 'so important to the community' that the principal should not be permitted to transfer those duties to another" (quoting *Daisy v. Roach,* 811 N.E.2d 862, 864–865 (Ind.Ct. App.2004) (quoting *Merrill,* 771 N.E.2d at 1267)), *trans. denied.*)

For the foregoing reasons, we affirm the trial court's grant of partial summary judgment in favor of The Estate and denial of summary judgment in favor of Capitol.

Affirmed.

BAILEY, J., concurs.

FRIEDLANDER, J., concurs with separate opinion.

FRIEDLANDER, Judge, concurring.

I fully concur in the decision to affirm partial summary judgment in favor of the Estate of Clinton Gray (the Estate) and deny summary judgment in favor of Capitol Construction Services, Inc. I write separately to explain my view that my vote in this case does not conflict with my vote in *Hunt Constr. Grp., Inc. v. Garrett,* 938 N.E.2d 794 (Ind.Ct.App.2010), which was vacated and is currently before our Supreme Court upon the grant of Hunt Construction Group's (Hunt's) petition for transfer. *See Hunt Constr. Grp. v. Garrett,* 950 N.E.2d 1212 (Ind.2011) (petition

for transfer granted and opinion at 938 N.E.2d 794 vacated).

In *Hunt,* Shannon D. Garrett was an employee of Baker Concrete Construction, Inc., working at a jobsite at which Hunt served as construction manager. Garrett was injured when she was struck by a piece of forming material that was being removed by another employee of Baker Concrete. Garrett sued Hunt on grounds that it had assumed a nondelegable duty to her through its contract with the owner of the property on which the jobsite was located, and on grounds that it had assumed a duty to her through its conduct. The trial court granted summary judgment in favor of Garrett on both grounds with regard to the question of duty. I dissented from the panel's decision that the trial court properly ruled against Hunt on the question of its liability via contract.

The majority in that case concluded that Hunt was liable under the contract between Hunt and the owner of the jobsite because the contract contained provisions that gave Hunt "significant duties regarding safety on the jobsite." *Hunt Constr. Grp., Inc. v. Garrett,* 938 N.E.2d at 804. I dissented upon my view that the majority essentially ignored provisions in the contract that clearly limited Hunt's liability for jobsite safety, thereby negating the element of duty with respect to the claims of the subcontractor's employee. Such limiting language included the following: (1) Various documents stated that Hunt's duties were undertaken "[w]ithout assuming the safety obligations and responsibilities of the individual contractors," one of whom was Baker Concrete, *id.* at 805; (2) one provision provided that Hunt "shall not have control over or charge of or be responsible for … safety precautions and programs in connection with the Work of

cross motion for summary judgment regarding whether Capitol assumed a duty of care

pursuant to its conduct on the premises. Accordingly, we need not address this issue.

each of the Contractors, since these are the Contractor's responsibilities", *id.;* (3) the contract provided that Baker Concrete would "remain the controlling employer responsible for the safety programs and precautions" applicable to its work and that Hunt's contractual responsibilities would "not extend to direct control over or charge of the acts or omissions of [Baker Concrete]", *id.* Finally, I noted that all of the foregoing provisions were included in the contract between Hunt and the jobsite owner. That contract also provided that Hunt's services were for the sole benefit of the owner and not the employees of a separate contractor on the project. I observed that, while "this duty may have coincidentally benefited the workers on-site, it does not alter the fact that Hunt Construction's obligations under its contract with the Owner were intended to benefit the Owner, not the workers of other contractors." *Id.* at 805–06. I concluded that the limiting provisions recited above clearly conveyed the parties' intent that Hunt was not responsible for project safety and that such responsibility remained with the individual subcontractors, in that case, Baker Concrete. *Hunt Constr. Grp., Inc. v. Garrett,* 938 N.E.2d 794 (Friedlander, J., dissenting).

I continue to adhere to the view that a general contractor or construction manager may shield itself from liability arising from a duty of care to onsite subcontractor employees, even when certain provisions of its contract with the owner charge it with duties pertaining to onsite safety measures, including enforcing OSHA safety requirements and offering safety programs. It does this by inserting language into the relevant contracts explicitly disclaiming duties concerning onsite safety with respect to all parties *except* the owner, most notably including subcontractors. It remains to be seen whether the Supreme Court will agree with my view as expressed in *Hunt.*

With respect to the instant case, however, the relevant contracts contained none of the limiting provisions I found dispositive in *Hunt.* For this reason, I fully concur in the affirmance of partial summary judgment in favor of the Estate and denial of summary judgment in favor of Capitol Construction.